T.C. Memo. 1996-160



UNITED STATES TAX COURT



HANS H. AND CHERYL E. HAMMANN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1384-88.                          Filed March 28, 1996.



Joellyn R. Cattell, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION


CARLUZZO, Special Trial Judge:  This case was heard pursuant

to section 7443A(b)(3) and Rules 180, 181, and 182.[1]  For the

_____

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue.  All
Rule references are to the Tax Court Rules of Practice and
Procedure.

years 1980 and 1981, respondent determined deficiencies in Hans

Hammann's Federal income taxes and additions to tax as follows:

| | | Additions To Tax | | |
|------|------------|--------------|------------------|------------------|
| Year | Deficiency | Sec. 6653(a) | Sec. 6653(a)(1) | Sec.6653(a)(2) |
| 1980 | $2,987 | $149.35 | --- | --- |
| 1981 | 608 | --- | $30.40 | [1] |

[1] This amount is 50 percent of the interest due on any part of the deficiency due to negligence.

Respondent also determined deficiencies in petitioners'

1983, 1984, and 1985 Federal income taxes and additions to tax as

follows:

| | | Additions To Tax | | |
|------|------------|------------------|------------------|-----------|
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
| 1983 | $10,150 | $508 | [1] | $2,538 |
| 1984 | 11,739 | 587 | [1] | 2,935 |
| 1985 | 14,307 | 715 | [1] | 3,577 |

[1] This amount is 50 percent of the interest due on any part of the deficiency due to negligence.

Respondent further determined that the increased rate of

interest imposed by section 6621(c) was applicable for each year

in issue.

The issues for decision are: (1) Whether for the years

1983, 1984, and 1985 Hans Hammann conducted a charter boat

service with the requisite profit motive to allow for deductions

under section 162(a), and, if so, whether petitioners can

substantiate the deductions claimed in connection with the

charter boat service for the years 1984 and 1985; (2) whether the

charter boat service gave rise to investment tax credits for the

years 1983, 1984, and 1985, and if so, whether the unused portions of those credits can be carried back to the years 1980 and 1981; (3) whether petitioners claimed excessive depreciation deductions for the years 1983, 1984, and 1985 with respect to a condominium owned by Cheryl Hammann and held for the production of income during those years; (4) whether state income tax refunds petitioners received in 1984 and 1985 must be included in their income for those years; (5) whether for the year 1985 petitioners understated their income by omitting $262 of interest; (6) whether for the year 1983 petitioners are entitled to a deduction for travel and entertainment expenses in connection with Hans Hammann's journalism activity; (7) whether for the year 1983 petitioners overstated their charitable contribution deduction by $1,959; (8) whether Hans Hammann is liable for the addition to tax imposed by section 6653(a) for 1980 and section 6653(a)(1) and (2)[2] for the year 1981; (9) whether petitioners are liable for the addition to tax imposed by section 6653(a)(1) and (2) for the years 1983, 1984, and 1985; (10) whether petitioners are liable for the addition to tax imposed by section 6661 for the years 1983, 1984, and 1985; (11) whether Hans Hammann is liable for the additional interest imposed by section 6621(c) for the years 1980 and 1981; and (12)

---

[2]It appears that respondent's determination was made under sec. 6653(a)(2), notwithstanding the reference to sec. 6653(a)(1)(B) in the notice of deficiency.

whether petitioners are liable for the additional interest imposed by section 6621(c) for the years 1983, 1984, and 1985.

Due no doubt in part to petitioners' departure and continuous absence from the United States since before the petition was filed in this case, the parties were unable to agree upon a stipulation of facts. See Rule 91. Petitioners did not appear at trial, nor did anyone appear on their behalf. The evidence consists of videotapes produced in connection with a videotaped deposition conducted pursuant to Rule 81(j); the transcript prepared from those tapes; certain exhibits proffered during the deposition; the testimony of an expert witness called by respondent; and exhibits introduced based upon admission requests served upon petitioners by respondent. At the time the petition was filed, petitioners resided in Poecking, Germany (then West Germany).

## FINDINGS OF FACT

General Background

Petitioners were married in 1982. They filed joint Federal income tax returns for the years 1983, 1984, and 1985. Hans Hammann filed returns for the years 1980 and 1981 as a single individual. Hans Hammann is a German citizen and Cheryl Hammann is a Canadian citizen. During the years 1983, 1984, and 1985, Hans Hammann was employed as a union executive in the San Francisco metropolitan area. He reported earnings from that employment for those years as follows:

| Year | Amount |
|------|--------|
| 1983 | $39,174 |
| 1984 | 41,391 |
| 1985 | 44,402 |

The earnings from Hans Hammann's employment with the union accounted for the majority of petitioners' income during those years.  Petitioners reported adjusted gross incomes, taxable incomes, and Federal income tax liabilities on their 1983, 1984, and 1985 Federal income tax returns as follows:

| Year | Adjusted Gross Income | Taxable Income | Tax Liability |
|------|----------------------|----------------|---------------|
| 1983 | $30,190 | $19,094 | -0- |
| 1984 | 22,192 | 9,242 | -0- |
| 1985 | 13,120 | (661) | -0- |

Cheryl Hammann was not employed during 1983, 1984, or 1985. In 1982, she enrolled in an undergraduate premedical program at an unspecified school presumably in the San Francisco area.

According to Cheryl Hammann, her husband worked in excess of 100 hours per week as a union official and was under a great deal of stress as a result of his position.  Apparently, the pressures of his employment caused Hans Hammann severe health problems that, together with financial setbacks, caused petitioners to move from the United States to Germany in 1986.  Prior to leaving the United States, Cheryl Hammann gave birth to a son, Andreas Hammann, on January 6, 1986.  Neither petitioner has returned to the United States since.

Charter Boat Service

In August of 1983, petitioners purchased a used 1976 Cheoy Lee sailboat. Petitioners named the sailboat the Malaguena. The Malaguena was a 41-foot ketch, with a fiberglass hull, powered by an in-line four-cylinder Perkins diesel engine.[3]

---

[3]In a promotional brochure published by its manufacturer, the sailboat was described as follows:

>      With this brochure we introduce a new model, a cruising yacht with a difference. As soon as you step aboard you will notice the wide and uncluttered side decks, teak of course, the modern-style tumble home on the cabin trunkings and the three large Plexiglass 2-way skylights which allow ample daylight illumination of the cabin interior. And you have a choice of three sail plans.

>      Down below the open-plan layout is on a single level entirely clear of obstructions due to the engine being completely below the floor amidships. The spacious public area is dominated by our unique horse shoe shaped dining table which can be lowered when required for use as a berth.

>      The cook has really large working surfaces and plenty of stowages, the angled sink configuration allowing very easy access to the dining table, with the main mast pillar in just the right place to hold on to in heavy weather.

>      There are more drawers, lockers and general stowages than you think because they are arranged differently. Standard equipment includes:- Choice of Perkins 4-108 50 BHP or Volvo MD-17C 36 HP diesel engines. Pedestal and wheel steering system. Bow and stern pulpits and side stanchions in stainless steel. Spruce spars, roller/slab reefing gear, deck and spar hardware, 2 sheet and 2 or 3 halliard winches depending on rig hardware, 2 sheet and 2 or 3 halliard winches depending on rig chosen, all hardware in stainless steel or bronze chromium plated. Navigation and cabin lights. Electric cold water pressure system suppling shower, wash basin and sink, sump tank,

(continued...)

Based upon Cheryl Hammann's deposition testimony and a survey of the Malaguena, it appears that the sailboat was in poor condition when acquired by petitioners. Numerous "conditions" were noted in the survey, with recommended corrections. The sails were in poor shape, and the cabin required refurbishing. The survey indicated that the sailboat was to be used for "pleasure" service and concluded that upon completion of the recommended repairs, the sailboat would be suitable for use. It is unknown whether the recommended repairs were made, and if so, over what period of time, or at what cost.

Petitioners purchased the Malaguena from an unrelated third party. The exact cost has not been provided to the Court; however, it appears to have been in the $80,000 range. In August of 1983, Hans Hammann borrowed $79,785 from First Interstate, the proceeds of which were used for the purchase of the Malaguena. The loan was characterized as a "simple interest personal loan", secured by the sailboat. The term of the loan was 15 years at an annual interest rate of 13.30 percent, repayable in monthly installments of $1,025.14.

---

[3](...continued)
electric sump pump, hand bilge pump, marine toilet and more besides.

At option you may have a diesel generator set, electric cooking stove with oven, refrigeration unit in the ice box, water heater, teak overlay on the cabin sides, compass and full set of electronics.

At her deposition, Cheryl Hammann referred to, and apparently produced, certain books and records relating to the operation of the charter boat service. According to Cheryl Hammann, the records reflect the amount of income earned and substantiate the expenses claimed for each year. The records supposedly were generated from a computerized data base that tracked the various expenses deducted and identified the folder where substantiating documentation could be found on an expense-by-expense basis. For reasons not fully understood by the Court, Cheryl Hammann did not attempt to place these books and records into the deposition record. Apparently, she did not want to part with the originals and did not bring any copies to the deposition. Whatever her reasons, the Court has not had the benefit of whatever information might have been contained in those records as no such records were available at trial.

Petitioners also maintained a handwritten log. In this log petitioners recorded the dates and times that the engine was started and stopped; the dates that the boat was chartered; and a summary of the events which took place during the periods that the Malaquena was chartered. Most of the entries in the log reflect usage not tied to a charter. During 1983, the log reflects that the Malaquena was chartered for a total of 13 days, excluding those instances where due to some mechanical failure petitioners refunded the fees to the chartering party. For the

years 1984 and 1985, the Malaguena was chartered a total of 17 days and 16 days, respectively. With the exception of occasional references to refunds, the log contains little financial information regarding the operation of the charter boat service. The log also includes entries unrelated to the sailboat, such as Hans Hammann's impressions regarding his employment with the union.

Petitioners attempted to solicit business by circulating flyers to incoming tourists at area airports. They also relied upon "word of mouth" referrals from previous customers. Other than these two methods, petitioners used no advertising. They did not offer the charter boat service through brokers or rental agents. Petitioners would generally charter the boat only on weekends or other times that did not conflict with Hans Hammann's employment with the union. Petitioners were always present on the Malaguena during the charters. They would only allow a member of a charter party to actually sail the boat if the person passed a sailing proficiency test administered by Hans Hammann, who was an experienced sailor. When a member of a charter party was sailing the sailboat, petitioners described themselves as "the crew". From time to time Cheryl Hammann would prepare meals in advance and serve them to the charter party while sailing. Usually wine was also available, but after an unpleasant experience petitioners did not allow the consumption of other

alcoholic beverages aboard the sailboat. Although it is not entirely clear from the record, it appears that petitioners initially charged $250 per day to charter the Malaguena.

Charter boat services conducted in the manner in which petitioners conducted their activity are known as bare boat charters, and boats used for such purposes must be registered with the U.S. Coast Guard. Boats which have not been manufactured in the United States are not eligible to be registered for such usage. The Malaguena was not manufactured in the United States, nor was it registered with the U.S. Coast Guard.

Apparently, Hans Hammann enjoyed sailing a great deal. He was an experienced sailor and had been involved in various activities involving sailing prior to the years in issue. As best as can be determined from the record, he spent a significant amount of time on the Malaguena. He wanted to take his son, Andreas, for a sail the day after the child was born, but Cheryl Hammann objected. He had to wait until Andreas was 3 days old to do so.

For the years 1983, 1984, and 1985, petitioners reported on Schedules C[4] the following amounts of income and expenses attributable to the operation of the Malaguena:

_____

[4]The Schedules C identified Hans Hammann as the proprietor of the charter boat service.

|                | 1983   | 1984   | 1985   |
|----------------|--------|--------|--------|
| Gross income   | $3,250 | $5,680 | $6,400 |
| Expenses:      |        |        |        |
| Advertising    | ---    | 77     | ---    |
| Car & truck    | ---    | ---    | 1,680  |
| Depreciation   | 11,974 | 18,579 | 19,186 |
| Insurance      | 846    | 1,083  | 2,055  |
| Interest       | 3,860  | 10,843 | 11,745 |
| Repairs        | 3,432  | 462    | ---    |
| Supplies       | 800    | 1,368  | ---    |
| Taxes          | 857    | 701    | 1,391  |
| Travel & ent.  | 176    | 1,104  | ---    |
| Fuel           | 175    | 134    | ---    |
| Boat survey    | 176    | ---    | ---    |
| Berth rental   | 1,631  | 2,450  | 2,445  |
| Amortization   | 34     | ---    | ---    |
| Telephone      | ---    | 253    | 252    |
| Computer sup.  | ---    | 93     | ---    |
| Maintenance    | ---    | ---    | 15,473 |
| Misc.          | ---    | ---    | 1,325  |
| Net Loss       | 20,711 | 31,467 | 49,152 |

The net loss reported for each year was offset against petitioners' other income for those years. In addition, petitioners claimed investment tax credits stemming from the charter boat service for the years 1983 and 1984 in the amounts of $2,430 and $711, respectively. Hans Hammann claimed and received refunds of Federal income taxes paid for the years 1980 and 1981 as a result of carrying back his share of the unused investment tax credits from 1983 and 1984 to those years.

For the year 1983, respondent determined that the charter boat service constituted an activity not engaged in for profit within the meaning of section 183 and allowed expenses only in

accordance with the provisions of that section.[5]  For the years

1984 and 1985, respondent disallowed all of the expenses claimed

for lack of substantiation.  Unlike 1983, respondent did not

allow any expenses pursuant to section 183 for the years 1984 and

1985.  Due to respondent's characterization of petitioners'

charter boat service, all investment tax credits claimed relating

to that activity were disallowed.

Cheryl Hammann's Condominium

Prior to her marriage to Hans Hammann, Cheryl Hammann

purchased a condominium in Augsberg, Germany.  She paid 102,000

German deutschemarks for the property.  Petitioners converted the

purchase price to dollars using a conversion rate of 1.56

deutschemarks to the dollar, resulting in a cost basis of

$65,545.  In computing the depreciation deduction for each year,

they allocated 20 percent of the cost to land and 80 percent of

the cost to the building.  They used the 125-percent declining-

balance method to compute their annual depreciation deduction

based upon a 20-year useful life.  The condominium was rented to

unidentified tenants during the years 1983, 1984, and 1985.

After taking into account depreciation deductions claimed in

previous years the following depreciation deductions were claimed

on petitioners' returns with respect to this condominium:

---

[5]Consistent with respondent's determination, the allowed
expenses were taken into account in respondent's adjustment to
petitioners' itemized deductions.

| Year | Amount of Depreciation Deducted |
|------|-------------------------------|
| 1983 | $3,277 |
| 1984 | 3,072 |
| 1985 | 2,880 |

Respondent determined that the appropriate conversion rate from German deutschemarks to dollars at the time of the purchase was 2.13 deutschemarks to the dollar. She further determined that the useful life of the condominium was 25 years rather than 20, and that current depreciation deductions should be computed by using the straight-line method of depreciation. As a result, respondent reduced the depreciation deduction for each year as follows:

| Year | Amount |
|------|--------|
| 1983 | $1,743 |
| 1984 | 1,538 |
| 1985 | 1,346 |

The average conversion rate from deutschemarks to dollars during 1981 was 2.25 deutschemarks to the dollar.[6]

State Income Tax Refunds

Petitioners received refunds of state income taxes as follows:

| Year | Amount of Refund |
|------|------------------|
| 1984 | $1,538 |
| 1985 | 1,346 |

Petitioners did not include the refunds in income. Respondent increased petitioners' income for each year by the amount of the

---

[6]Statistical Abstract of the United States 887 (104th ed. 1984). See Fed. R. Evid. 201.

state income tax refund received during the year, explaining that a "refund of any part of your state income tax that you deducted in prior years, and reduced your Federal income tax in those years, is includable in income in the year you receive the income." On their 1983 and 1984 Federal income tax returns, petitioners claimed itemized deductions for state income taxes in the amounts of $1,545 and $1,367, respectively.

Journalism Activity

On their 1983 return, petitioners claimed a deduction in the amount of $2,381 for travel and entertainment expenses incurred with respect to a journalism activity conducted by Hans Hammann. Respondent disallowed the deduction claimed upon the ground that petitioners did not establish that the expenses were ordinary and necessary or were expended for the business purpose designated. No other evidence is included in the record with respect to this activity.

Charitable Contribution Deduction

Petitioners claimed $1,959 as a charitable contribution deduction on a Schedule A filed with their 1983 Federal income tax return. Respondent disallowed the entire deduction for lack of substantiation. No other evidence is included in the record with respect to this deduction.

OPINION

The Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he or she is entitled to any deduction claimed.  Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Welch v. Helvering, supra at 115.  This includes the burden of substantiation.  Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).  In addition, section 6001 requires the taxpayer to keep records sufficient to show whether or not the person is liable for tax.

Charter Boat Service

In general, section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  The term "trade or business" is not precisely defined in the Internal Revenue Code or the regulations promulgated thereunder.[7]  According to the Supreme Court, in order for an activity to be considered a

---

[7]Some sections do define the term for specific purposes. For example, sec. 7701(a)(26) provides as follows:  "The term 'trade or business' includes the performance of the functions of a public office."

taxpayer's trade or business, the activity must be conducted "with continuity and regularity" and "the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). In order for an activity to be considered a trade or business within the meaning of section 162, a taxpayer must conduct the activity with the requisite profit motive, or intent. Absent an intent to make a profit, the charter boat service could not be considered a trade or business within the meaning of section 162. See Commissioner v. Groetzinger, supra.

Implicit in the manner in which petitioners reported the income and expenses of the charter boat service is their contention that the activity constituted a trade or business within the meaning of section 162. Petitioners maintain that Hans Hammann was planning to terminate his regular employment in order to concentrate his time on the charter boat service. They claim that the Malaquena was acquired specifically to be used in a charter boat business.

Respondent argues that the charter boat service does not constitute a trade or business because Hans Hammann did not engage in such activity with the requisite profit objective. Consequently, according to respondent, petitioners cannot rely upon section 162 to support the claimed deductions. Because of respondent's characterization of the charter boat service,

respondent also denied all investment tax credits claimed by petitioners with respect to certain assets used in the activity.

We begin with an examination of whether Hans Hammann conducted the charter boat service with the intent to make a profit. The test for determining whether a taxpayer conducted an activity for profit is whether he or she entered into, or continued, the activity with the actual or honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. The taxpayer's expectation of profit need not be reasonable, but the profit objective must be bona fide, as judged by all facts and circumstances. Dreicer v. Commissioner, supra at 645; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

Whether Hans Hammann engaged in the charter boat service with the requisite profit objective must be determined on a year-by-year basis from the facts and circumstances of the case. Golanty v. Commissioner, supra at 426; sec. 1.183-2(a) and (b), Income Tax Regs. More weight is given to objective facts than to subjective statements of intent. Sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proving that Hans Hammann engaged in the charter boat service with the actual and honest

objective of realizing a profit.  Rule 142(a); Golanty v. Commissioner, supra at 426.

The following factors, which are nonexclusive, should be considered in the determination of whether an activity is engaged in for profit:  (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  Sec. 1.183-2(b), Income Tax Regs.  No one factor is determinative in and of itself, and a profit objective does not hinge on the number of factors satisfied.  Sec. 1.183-2(b), Income Tax Regs.

Based upon an examination of all the facts and circumstances, and taking into account the above factors, we are unable to conclude that Hans Hammann conducted the charter boat service with a bona fide, honest and objective profit motive.

We find that the charter boat service was operated not with the requisite profit objective necessary to be considered a trade or business, but rather as a means to subsidize a recreational

activity. Hans Hammann obviously derived a great deal of personal pleasure from sailing as evidenced by his desire to involve his son in the activity shortly after the child's birth.

It is also obvious, based upon the types of expenses reported on the Schedules C, that sailing can be a financial burden. With the exceptions of a de minimis amount for advertising in 1984, and marginal fuel costs, the expenses incurred by petitioners in connection with the ownership and use of the Malaquena would have been incurred regardless of the operation of the charter boat service. Most likely Hans Hammann was aware of the fixed costs that would be involved in owning, maintaining, and sailing a boat such as the Malaquena. Given petitioners' financial status at the time the sailboat was acquired, he no doubt realized that he would have to offer the charter boat services in an attempt to subsidize such costs. Because of the demands of his employment with the union, Hans Hammann could only devote limited periods of time to the charter boat service. Considering such time limitations against Hans Hammann's practice not to offer the Malaquena for charter unless he was present on the boat, it would appear to be impossible for the charter boat service to be a profitable operation during the relevant years. We conclude that the Malaquena was acquired by petitioners for recreational purposes, albeit with the intent to offset some of the costs of ownership through the charter boat

service. Such an intent is not a sufficient profit motive for purposes of section 162.

Accordingly, for the year 1983, respondent's allowance of the expenses attributable to the operation of the charter boat service only to the extent permitted by section 183 is sustained. In addition, because petitioners have failed to substantiate any such expenses deducted in 1984 and 1985, respondent's adjustments disallowing the deductions for those years are likewise sustained. Sec. 6001.

Because petitioners have failed to persuade us that the charter boat service was conducted as a trade or business, it follows that respondent's disallowances of the investment tax credits for the years 1983 and 1984 must also be sustained, and we so hold. Secs. 38, 48. It further follows that Hans Hammann improperly claimed investment tax credit carrybacks to the years 1980 and 1981, and the deficiencies determined by respondent against him for those years are sustained as well.

Cheryl Hammann's Condominium

The dispute on this issue arises primarily from respondent's determination that petitioners used an improper currency conversion rate in computing the depreciable basis of the property. The conversion rate used by respondent in making her adjustments is more favorable to petitioners than the average conversion rate for the years involved. In any event,

respondent's determination, having been made in the notice of deficiency, is presumed correct, and petitioners have the burden of proof to establish that such determination is erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. at 115.  This they have failed to do.  Accordingly, respondent's adjustments to petitioners' depreciation deductions for the years 1983, 1984, and 1985 are sustained.

## State Income Tax Refunds

Respondent included in petitioners' gross income state income tax refunds in the amounts of $1,538, and $1,346 for 1984, and 1985, respectively.  Section 111(a) provides that a refund of taxes for which a deduction was allowed in an earlier year must be included in the year of receipt, except to the extent the earlier deduction did not result in a tax benefit.  Tracy v. Commissioner, T.C. Memo. 1985-40.  Because petitioners claimed itemized deductions for the years 1983 and 1984 for state income taxes paid, it would appear that the exception set forth in section 111(a) is not applicable.  Consequently, respondent's adjustments increasing petitioners' income by the amounts of state income tax refunds received in the years 1984 and 1985 are sustained.

## Interest Income

Respondent determined that petitioners understated their income by omitting $262 of interest income received in 1985.

Except as otherwise provided, gross income includes all income from whatever source derived, including interest income. Sec. 61(a)(4); sec. 1.61-7, Income Tax Regs. Petitioners have presented no evidence to challenge respondent's determination on this issue, and accordingly, we hold for respondent.

Hans Hammann's Journalism Activity

As indicated above, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he or she is entitled to any deduction claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. at 440; Welch v. Helvering, supra at 115. This includes the burden of substantiation. Hradesky v. Commissioner, 65 T.C. at 90. Deductions for travel and entertainment are subject to the more stringent substantiation requirements imposed by section 274(d).

Petitioners have not presented any evidence to show that the travel and entertainment expenses deducted in 1983 were ordinary and necessary expenses incurred in carrying on a trade or business. In addition, petitioners have not carried their burden of proof with respect to the substantiation requirements imposed by section 274(d). Accordingly, we sustain respondent's determination on this point.

Charitable Contribution Deduction

Section 170 provides for the allowance as a deduction of any charitable contribution as defined under section 170(c) made

within a taxable year.  Sec. 170(a).  Section 1.170A-13(a)(1),
Income Tax Regs., provides that for contributions of cash a
taxpayer shall maintain for each contribution a canceled check or
receipt from the donee indicating the name of the donee, the date
of the contribution, and the amount of the contribution, or in
the absence of a check or receipt from the donee, reliable
written records.

Petitioners have presented no evidence to substantiate the
charitable contribution deduction claimed for 1983.  Petitioners
have failed to satisfy their burden of proof.  Accordingly,
respondent's determination with respect to this issue is
sustained.

Additions to Tax

Section 6653(a), for the year 1980, and section 6653(a)(1),
for the years 1981, 1983, 1984, and 1985, impose an addition to
tax of 5 percent of the underpayment if any part is due to
negligence or intentional disregard of rules or regulations.  For
the years 1981, 1983, 1984, and 1985, section 6653(a)(2) imposes
an additional addition to tax equal to 50 percent of the interest
payable under section 6601 with respect to the portion of the
underpayment attributable to such negligence or disregard of
rules or regulations.  Negligence is a lack of due care or
failure to do what a reasonable and ordinarily prudent person
would do under the circumstances.  Neely v. Commissioner, 85 T.C.
934, 947-948 (1985).  Petitioners have the burden of proving

error in respondent's determination that these additions to tax should be imposed against them.

Petitioners have failed to demonstrate that they were not negligent or that they had a reasonable basis for claiming any of the deductions in dispute. Petitioners have not satisfied their burden of proof and accordingly, the additions to tax under section 6653(a) and section 6653(a)(1) and (2) are sustained.

Section 6661(a) provides for an addition to tax equal to 25 percent of an underpayment when there is a substantial understatement of income tax for the taxable year. Section 6661(b)(2)(A) defines the term "understatement" as being the excess of (i) the amount of tax required to be shown on the return for the taxable year over (ii) the amount shown on the return. Section 6661(b)(1)(A) provides that an understatement is substantial if it exceeds the greater of (i) 10 percent of the amount of tax required to be shown on the return or (ii) $5,000. For this latter purpose, an understatement is reduced to the extent it is either based on substantial authority or adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B).

Petitioners have not presented any evidence to refute respondent's determination under section 6661. Accordingly, petitioners have not carried their burden of proof, and respondent's determination with respect to the imposition of the section 6661 penalty is sustained.

Section 6621(c)

Respondent also determined that petitioners are liable under section 6621(c) for increased interest on all or a portion of their tax deficiencies for all years in issue.  Section 6621(c) provides that increased interest is due if a "substantial underpayment" is attributable to a "tax motivated transaction". A "substantial underpayment" is an underpayment of more than $1,000.  Sec. 6621(c)(1).  Deductions disallowed because an activity was not engaged in for profit are deemed attributable to a tax-motivated transaction.  Sec. 301.6621-2T, Q&A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984).  We have determined that the charter boat service was not entered into for profit.  Accordingly, we hold that Hans Hammann is liable for the increased interest imposed by section 6621(c) with respect to the entire amount of the deficiencies for the years 1980 and 1981.  We further hold that petitioners are liable for the increased interest imposed by section 6621(c) with respect to the portions of the deficiencies for the remaining years in issue attributable to the deductions disallowed because the charter boat service was not conducted for profit.

To reflect the foregoing,

Decision will be entered

under Rule 155.